In The
*Court of Appeals*
*Ninth District of Texas at Beaumont*
NO. 09-23-00398-CR

DARRYL DWAYNE PREVOST, Appellant

V.

THE STATE OF TEXAS, Appellee

**Criminal District Court**
**Jefferson County, Texas**
**Trial Cause No. F22-39803**

## MEMORANDUM OPINION

A jury rejected Darryl Dwayne Prevost's self-defense claim and convicted him of the first-degree felony offense of murder of Alfonso Solomon. In a special issue, the jury found that Prevost failed to prove he acted under the influence of sudden passion and assessed punishment at seventy-six years of confinement. The trial court sentenced Prevost accordingly. Prevost challenges the trial court's judgment, and in two issues asks whether: (1) the evidence is legally and factually

sufficient to support a conviction for murder by the jury rejecting his self-defense claim; and (2) the evidence was legally and factually sufficient for the jury to find he committed the murder by rejecting his sudden passion defense. We hold (1) the evidence was sufficient to support a conviction for murder and for the jury to reject the claim of self-defense, and (2) the evidence was sufficient to support the jury's rejection of the affirmative defense of sudden passion. As more fully explained below, we affirm the trial court's judgment.

## BACKGROUND AND TRIAL EVIDENCE

### Overview of Events

Solomon's grandmother worked at a local McDonald's. One night after 10:30 p.m., as the store prepared to close for inside service and switch solely to drive-through service, Solomon arrived at the McDonald's. He entered the store but was told by an employee that they were preparing to close, and he needed to use the drive-through line. Solomon then proceeded to the drive-through line.

A few minutes later, a car driven by Darionte Everfield pulled into the same McDonald's parking lot, where his mother also worked. Prevost was a passenger in the vehicle Everfield drove. Everfield exited the vehicle and went inside the store where he got a drink while Prevost remained outside in the car.

Solomon, Everfield, and Prevost knew each other. When Everfield drove up, Solomon pulled out of the drive-through line and beside Everfield's vehicle but did

2

not get out. When Everfield exited the McDonald's, he approached Solomon's vehicle; Solomon eventually opened his door and stood near his car. Solomon and Everfield argued. At some point, Prevost began shooting at Solomon, who attempted to run away and back toward the drive-through line. Prevost admitted that he fired four or five shots from the passenger's side of the vehicle, and as Solomon ran away, Prevost continued shooting. Solomon died at the scene.

Prevost asserted he shot Solomon in self-defense. In an interview with a detective after his arrest, Prevost claimed that: (1) Solomon threatened to kill him and Everfield; (2) he feared for his life; and (3) he shot Solomon when he saw Solomon reach for a gun. Police found a handgun registered to Solomon's mother in the vehicle Solomon drove, but the gun was holstered and did not have a round in the chamber.

We now summarize the evidence admitted at trial.

**Testimony of Sarah Bennett**

Sarah Bennett testified that she is a dispatcher for the cities of Nederland, Port Neches, and Groves. Bennett testified that while working on April 14, 2022, they received a 911 call about a shooting at McDonald's on Twin City Highway. She identified State's Exhibit 1 as the recorded 911 call, which was admitted into evidence and played for the jury.

3

**Testimony of Joshua Berry**

Joshua Berry testified he is a police officer who works for the Groves Police Department. On April 14, 2022, Berry worked the evening shift with his field training officer, and they were dispatched to a shooting at the McDonald's on Twin City Highway in Groves. When they arrived, they observed "a black male laying on the ground near the order menu at the drive-through line[,]" face down and unresponsive. When they rolled him over, they believed he was dead since he was unresponsive, and they saw blood on his coveralls.

Berry testified they located the man's vehicle, processed it, and photographed it. Berry described the items in the vehicle, including a blanket in the driver's seat, and "underneath that blanket, close to the, . . . edge of the seat where, . . . your legs would sit, there was a firearm that was there, a handgun." He recalled it had a purple grip with a pink holster, which he photographed, and it was registered to Solomon's mother.

Berry explained that Groves does not have its own crime scene unit, so a Port Arthur crime scene unit arrived to assist. The McDonald's is located near the city limits of Groves and Port Arthur, so several officers from Port Arthur were on the scene at the time the detectives from Groves arrived.

Berry testified that he wore a body camera that recorded the scene. Video footage from Berry's body camera was admitted into evidence during his testimony

4

and played to the jury. Among other things, Berry testified the video showed officers locating the firearm inside Solomon's vehicle. Berry explained at one point the video showed officers looking at a bullet impact in Solomon's vehicle near the window that did not fully penetrate and "stuck in the door frame[.]" He photographed everything he could, since it might be evidence. During his testimony, Berry identified various photographs that were admitted into evidence.

**Testimony of Malaurie Hammonds**

Malaurie Hammonds testified that in 2022, she worked as a forensic specialist with the Port Arthur Police Department. Her duties included collecting evidence and documenting crime scenes with pictures, videos, and obtaining fingerprints. On April 14, 2022, Hammonds responded to the McDonald's on Twin City Highway. She explained that since Groves Police Department did not have a crime scene team, she offered her assistance, which is a common practice.

Once Hammonds arrived at the McDonald's, she began processing the scene. She identified photographs she took, which were admitted into evidence and shown to the jury. Hammonds testified that four evidence markers placed outside Prevost's vehicle showed locations of shell casings, which were 9-millimeter Luger rounds. She noted that there were two RIP 9-millimeter Luger rounds and two NIR 9-millimeter Luger rounds. Other officers also pointed out a few bullet holes on the victim's vehicle, and she noticed some herself, so she marked them with a sticker.

5

Additionally, officers directed her to apparent blood on the ground, which she photographed. Hammonds testified they retrieved a projectile or bullet near the corner of the McDonald's building where the drive-through and sidewalk are located, and another bullet fragment closer to the victim's vehicle.

Hammonds documented that the victim's vehicle was a gray Chevrolet Impala, which was not moved before she arrived. They located an iPhone inside the victim's vehicle on the driver's seat near a towel, which appeared to have blood on it, although she did not notice that originally. Hammonds testified that she began marking bullet holes on the vehicle and noticed bullet holes "all throughout the vehicle[,]" which were depicted in photographs shown to the jury. She said the bullet holes were in the driver's side of the vehicle, including in the driver's side window.

Hammonds stated that while she processed the scene, other officers "were digging through the [victim's] vehicle . . . trying to find evidence, and they pointed out" a firearm to her, which she photographed and described as purple. Hammonds explained the handgun was not photographed in the location where officers found it inside the vehicle; they moved it to the position on the floorboard, so she could photograph it. She did not collect the handgun, because Groves PD said they would get it from the vehicle. Hammonds noted that, before she photographed it, the pistol was holstered, and she also photographed the gun's serial numbers. Hammonds did not have any reason to believe that firearm was used in the shooting, so she did not

6

swab it for biological evidence. Officers located Solomon's driver's license at the scene, and they asked her to photograph it.

Hammonds testified that Groves PD impounded the vehicle, towed it to their lot, and processed it, but she was not present when they processed it. Hammonds understood that Solomon was not sitting inside the vehicle but beside it when the shooting occurred. When looking for evidence relevant to the shooting, she focused her attention on the direction Solomon purportedly ran. She knew another vehicle was involved, but at the time, it had not been located.

Hammonds took the bullet fragments and casings collected at the crime scene, then processed them at the Port Arthur PD lab. Photographs of the casings, along with the projectile fragments were admitted and shown to the jury. Hammonds testified that she processed the casings for touch DNA and latent fingerprints, and although finding those things is "[v]ery rare[,]" it is possible.

She also received a request to photograph Solomon at the hospital to document the bullet holes. Photographs Hammonds took of Solomon at the hospital showing the bullet wounds were admitted and shown to the jury. Hammonds noted bullet wounds to Solomon's chest, left arm, left side, and back.

**Testimony of Sue Kelley**

Sue Kelley testified she works for the Jefferson County Sheriff's Office and is the captain over the Forensics Crime Scene Unit. Kelley said that she is often asked to look at latent fingerprints pulled from a scene or to determine if fingerprints can be pulled. In this case, on April 20, 2022, the crime lab asked her to assist in processing a car Groves PD had in their garage to see if she could pull any latent fingerprints or make comparisons.

The vehicle Kelley examined was a 2017 Dodge Journey Crossroad, but she did not remember the color. It had a paper buyer's tag "No. 35916, P as in Paul, 5." Kelley testified that she was able to lift four latent prints from the vehicle, one from the inside of the window on the passenger door and three from the rearview mirror. She compared those latent prints to those of three known individuals, including Solomon, Prevost, and Everfield, but the latent prints did not match their prints.

**Testimony of Tammie Engle**

Tammie Engle testified that she is a police officer for the Port Arthur Police Department. On April 18, 2022, while on patrol, near 500 Duane Street, she "noticed a red Dodge Journey matching the description that had been sent out from Groves PD." Engle said Groves sent out an "[a]ttempt to locate" on a vehicle matching that description in connection with a murder. Engle explained that because the vehicle was located "way back on the property" she could not see the "temp tag" to confirm

8

it was the vehicle, so she called her sergeant. When her sergeant arrived, they confirmed the tag matched the vehicle Groves PD was looking for.

Engle's body camera footage was admitted into evidence and played for the jury. Engle testified they contacted Groves PD, confirmed it was the vehicle, and two Groves PD detectives came out. Engle then called a tow truck and waited for it to arrive, which was the end of her involvement. Engle identified photographs of the vehicle, which were admitted and shown to the jury.

**Testimony of Ida Winn**

Ida Winn testified that Solomon was her oldest grandson and was nineteen. Winn had heard of Darionte Everfield but was "not familiar with him." She did not know Prevost "personally" but had "seen him around."

Winn works at the McDonald's on Twin City Highway in Groves but was off when the shooting occurred. Winn said that Felisha Johnson is a manager at the McDonald's, and Jacqueline Antoine is their general manager.[1]

On the night of April 14, 2022, Winn received a phone call and learned her grandson, Solomon, was shot at the McDonald's where she worked. Winn testified that before the shooting, she voiced concerns to Antoine about working with Johnson, because Johnson's sons and Solomon "were having altercations outside of my job."

---

[1] In the record, Jacqueline Antoine's name is also sometimes spelled "Jacquelyn," but for purposes of clarity and consistency we have used the spelling most often used throughout the record.

Winn explained that she just wanted to give Antoine a "heads up" in case anything happened at the store. According to Winn, Johnson's sons were at the McDonald's regularly.

Winn testified that she was worried about Solomon's safety but was not concerned with him being involved with guns, because she had never seen him with a gun. She explained that Solomon's mother was Monique Simpson, who drove a silver or gray Impala and owned a firearm.

**Testimony of Jacqueline Antoine**

Jacqueline Antoine testified that she works as a general manager for McDonald's on Twin City Highway in Groves and has worked there since 2018. Although she was employed there on April 14, 2022, she did not work that day. She said that night about 10:45, she received two phone calls, one from her boss telling her something happened at the store and the second from another manager who left a voicemail that someone was shot at the location. Upon receiving the calls, Antoine immediately went to the McDonald's.

Antoine knew Felisha Johnson and Ida Winn, who worked for her at the McDonald's. Before the shooting, Winn approached Antoine and expressed concerns about her grandson and Johnson's children. According to Antoine, Winn told her that Solomon, and Johnson's children had "altercations" and "were feuding" before the shooting. Winn feared she and Johnson would lose their jobs over it.

10

Antoine had seen Darionte Everfield, one of Johnson's sons, and she knew that Johnson had two other sons, Dontrell Roberson and Larry Roberson. The three boys came often to McDonald's to see their mother, to get food, and money. Antoine testified that Winn was concerned about them coming to the McDonald's and did not want any altercations "at the job." Antoine clarified that Winn did not want a disagreement between Solomon and Everfield affecting her job or relationship with Johnson.

When Antoine arrived at McDonald's, detectives were there. The detectives asked for their surveillance video, and Antoine watched it with them. Antoine testified James Parish, her supervisor, had access to the surveillance video and was there that night.

**Testimony of Ryyon Bruton**

Ryyon Bruton testified that she works as a manager at the McDonald's in Groves and worked the evening shift on April 14, 2022. Bruton indicated that although the restaurant is open twenty-four hours, the inside closes at 11:00 p.m., and everyone must use the drive-through after that time. Bruton said she knew Everfield, because Bruton worked with his mother. Bruton identified photographs of Everfield from the night he came into the store, which were admitted into evidence and shown to the jury. She had also seen Solomon around.

11

Bruton said that night, Everfield came into the store, and she took his order. Once Bruton took Everfield's order and handed him the drink, Bruton returned to counting money drawers in the back of the store. After that, other employees ran to Bruton and told her somebody was outside shooting, but she did not hear the shots.

Bruton explained that she went outside and saw "the car parked in the front with bullet holes in it." She noted that once she went outside, there was a police officer already there. Bruton eventually saw someone lying down, and the officer who turned him over asked if Bruton knew the person. Bruton testified she did not know his real name but told the officer, "I think that's the little boy, Fonso." Bruton then went inside and called her manager to tell him what happened.

**Testimony of James Parish**

James Parish testified that he is an area supervisor for McDonald's and runs multiple locations, including the one on Twin City Highway in Groves. On April 14, 2022, Parish received a call from a shift manager, who reported that someone was shot in the parking lot. Parish indicated that he oversaw the surveillance system there. He explained how the video footage was stored for the jury. He testified that the McDonald's surveillance system records continuously from many angles, and they keep the correct dates and times on the system.

That night, Parish met with Detective Chris Robin from Groves PD and downloaded a copy of the surveillance footage for him. Parish watched a copy of the

12

video before he provided it to Detective Robin. Parish identified the surveillance video he downloaded, which was admitted into evidence and played for the jury.

Parish described what he saw on the surveillance video for the jury. He said that he observed a silver Impala enter the parking lot, and a man exited the car, came inside, and went to the bathroom. After that, the man left the building, returned to the silver Impala, and pulled into the drive-through line. Parish did not initially know why the man returned to his car but later learned another McDonald's employee told him the lobby was closed. While the man was in the drive-through line, a red Dodge Journey SUV pulled into the parking lot.

Once the red SUV pulled up, that driver exited the vehicle and went inside the restaurant. Parish explained the red SUV's driver was an employee's son, who talked to another employee while inside. Then, the man in the silver car left the drive-through line and pulled back around as the man inside the restaurant walked outside to his car; the silver car parked next to the red Dodge Journey. Parish agreed that it appeared the lights of the red Dodge Journey flashed about the time the silver Impala pulled out of the drive-through line. The man exiting the McDonald's walked to the silver Impala, leaned and looked into the driver's side windshield of the silver car. Parish said it appeared the man who exited the McDonald's and the one in the silver Impala were arguing. It also looked like the man who exited the store opened the red SUV's front passenger's door. It then appeared that there were flashes of light from

13

the passenger's side of the red SUV, then two more, and it appeared the individual in the silver Impala had his left hand on the door handle. At one point, the driver of the silver Impala flinched, then took off running. Parish testified you could see another flash from the red Dodge Journey's passenger's side after the man from the Impala began running. After that, the red SUV backed up then left the parking lot. When Parish watched the video, he observed that the man who was shot ended up by the drive-through.

**Testimony of Kenedi Charlot**

Kenedi Charlot testified that she has two daughters with Everfield and knows Prevost, because "[h]e used to hang around with" Everfield. Charlot identified Prevost in court. Charlot also knew Solomon, because the guys "all just hung around each other at a point in time." Charlot likewise knew Everfield's two younger brothers, Larry and Dontrell, who also "hung around" the others.

According to Charlot, Everfield's younger brother, Larry, had children with Prevost's sister. She also explained that Lachassity Johnson[2] is Everfield's aunt, whom he and his brothers occasionally stayed with. Lachassity owned a red Dodge Journey that Everfield sometimes drove.

---

[2] We refer to this individual by her first name for the purpose of clarity, as another individual discussed in the background has the same last name.

Charlot testified that she was unsure if Everfield and Solomon had problems. Nevertheless, she indicated that they argued over her before, and "[t]hey probably passed a couple words, but not just serious." She said that Everfield and Solomon got over that, though. Charlot testified she was unsure if Prevost had any issues with Solomon.

Charlot knew of the shooting that occurred at McDonald's on April 14, 2022. She testified she did not know who was involved in the shooting. Charlot denied speaking with Everfield or Prevost between April 14 and April 21, while the police looked for them. She learned after the fact that police arrested Everfield for the shooting.

Charlot said that Everfield called her from the Jefferson County correctional facility, and she called Prevost while he was in the same facility. Charlot indicated that she and Prevost spoke about the shooting but claimed, "I didn't tell him anything . . . it started by me checking on him, and then it was just a conversation. He didn't really say nothing." She then testified that Prevost confessed to the shooting but "that was all he said." During this line of questioning, Charlot confirmed that Everfield's nickname was "Darry," and Prevost's nickname was "Lil Doom."

**Testimony of Lachassity Johnson**

Lachassity Johnson testified that Everfield is her nephew, and she knew Prevost through her nephews, including Everfield, Larry, and Dontrell. Lachassity identified Prevost in court.

On April 14, 2022, Lachassity lived on 25th Street in Port Arthur with her nephews, Larry, Dontrell, and Everfield. At the time, she worked in Sabine Pass and drove a white Honda Accord. Lachassity testified that she also had a red Dodge Journey. Lachassity allowed her nephews to drive the red Dodge Journey but did not let anyone else drive it.

She explained that on April 14, 2022, she worked a half day due to the holiday. She normally worked the 5 p.m. to 5 a.m. shift, but that day she was getting off at 11 p.m. Shortly before she got off work at 11 p.m., Lachassity's mother called her about a shooting that involved Lachassity's vehicle. Lachassity's mother said that Prevost shot someone while he was sitting in her red Dodge Journey. Lachassity testified that after receiving the phone call, she clocked out of work at 11 p.m. accompanied by her sister, Latricia, who also worked there. After they left work, Lachassity dropped Latricia off at her house, then she proceeded to her home on 25th Street.

When she arrived home, Lachassity saw her three nephews, Prevost, and a "couple more" of their friends, but her red Dodge Journey was not there. She denied

16

that she let Prevost drive her red Dodge Journey. When she asked Everfield where her red Dodge Journey was, he did not tell her. Lachassity testified she was nervous, because somebody just shot someone while using her vehicle. She said that Everfield and Prevost were "nervous," but Larry and Dontrell did not seem nervous, because they had been at the house the entire time. She testified that she asked Prevost why he shot someone, and he responded that Solomon "should have never said that he was going to kill me and [Everfield] and started reaching for a weapon."

After Lachassity asked for her vehicle, she told them, "I want everybody out of my driveway." She noted there was a white car parked a little past her driveway she did not recognize. At that point, Lachassity observed Prevost and Everfield start to leave by walking towards the end of the driveway.

In the early morning hours after the shooting, Lachassity spoke to Detective Tony Phillips with Groves PD and provided a statement. Although Lachassity did not recall making an earlier statement to police about who Solomon associated with, on cross-examination she was shown an earlier statement. She did not tell Detective Phillips that Prevost told her that Solomon was reaching for something or that Solomon hung out with gangs. Lachassity explained that her nephews were unemployed at the time, and so was Prevost.

Lachassity testified that she knew Solomon, because all those kids "hung out" together. She explained that Everfield and Solomon had a disagreement over Kenedi

17

Charlot, with whom Everfield had a child. Lachassity testified that Everfield and Solomon were over that disagreement; they talked it out, and it blew over. She explained that after the disagreement, though, the group "split up[,]" and they "went separate ways." Lachassity heard her nephews speak about gangs but did not know who was in which gang. About a year before the shooting, Prevost ran up to her house out of breath three times in one week, and when Lachassity asked about it, each time, he told her that Solomon "just pulled up on me with a gun[.]" She testified that if Prevost told police he did not know her nephews Larry and Dontrell, that was untrue. She also indicated that if Prevost told police he did not go to Lachassity's home on 25th Street after the shooting, that was untrue.

**Testimony of Scott Thompson**

Scott Thompson is a detective with the Port Neches Police Department. He testified that he became involved in this case when Groves PD asked him to perform cell phone extractions. Thompson explained that he used a Cellebrite device to perform the extractions and described how the technology worked.

Thompson testified that Detective Robin from the Groves PD asked him to assist with the downloads in this homicide investigation and brought Thompson three cell phones. Thompson said that all three devices powered on, but he could only conduct an extraction on one device. Thompson received an iPhone 12 Pro Max, a Samsung Galaxy S8, and a BLU Smartphone. Thomspon explained that he could

18

not perform extractions on the iPhone or the Samsung Galaxy since they were password protected, but he performed an extraction on the BLU phone because it was not passcode protected. He said that he put the extraction on a USB, which he identified as a fair and accurate representation of the data extracted.

**Testimony of Chris Robin**

Chris Robin testified he works as a patrol sergeant for the Groves Police Department. He explained that on April 14, 2022, he was an investigator there. As the on-call investigator that day, Robin received a call about 10:50 p.m. about a shooting at the McDonald's on Twin City Highway in Groves. After receiving the call, Robin went to the scene, and another officer provided him with "a synopsis of what was going on."

Then, Robin, the McDonald's regional manager, and a technician went through the surveillance video to try to see what happened. Robin explained that he "was looking for suspect information, vehicle information, times, when it occurred, what exactly occurred, [and] where it occurred[.]" He testified that he initially looked at two cameras viewing the southeast section of the building, and the cameras showed the entrance on that side of the parking lot; when he arrived, there was a silver vehicle there. When they watched the video, though, Robin also observed a red Dodge Journey and rewound the tape to see an individual exiting that vehicle. He noted that initially, the Dodge Journey was alone in the parking lot, an individual

19

exited the Dodge Journey and walked inside. Then, a silver car pulled up next to the Dodge Journey. The driver of the Dodge Journey then exited the McDonald's, walked directly to the silver vehicle, and looked inside the windshield, "obviously trying to interact with the person that was inside that vehicle."

Robin explained later that further investigation and reviewing additional surveillance footage established that the silver Impala arrived first and parked on the side of the building. That car was driven by Solomon and owned by Solomon's mother, Monique Simpson. Solomon tried to go inside but was told he would need to use the drive-through. While Solomon was in the drive-through line, the red Dodge Journey pulled up and parked. At that point, Solomon exited the drive-through and parked beside the red Dodge Journey.

Robin said that when Solomon parked beside the other car, its window was up, and Solomon did not interact with the red Dodge Journey's passenger while Everfield was inside the McDonald's. He explained that the silver Impala's driver did not initially exit his vehicle when the driver of the red vehicle came over; only when the driver of the red vehicle "is extremely close to that car," the silver Impala's driver got out.

Robin testified that when Everfield exited the McDonald's, he walked directly to the silver Impala. That is when the driver of the silver vehicle exited, and both drivers "had a series of conversations that seemed to be progressing in an aggressive

20

manner over time." He said the two drivers stood there and exchanged words very closely in what was "probably aggressive conversation." He described the red Dodge Journey's driver walking away several times but returning to the conversation. Robin said that it did not appear the driver of the silver vehicle ever interacted with the passenger in the red Dodge Journey or that the passenger in the Dodge Journey ever exited that vehicle. Robin testified that "it seemed to always be between the driver of the two vehicles and not the passenger."

Robin said the red Dodge Journey's passenger's front window rolled down, and "[v]ery soon after that[,]" the driver of the red vehicle, walked to the back of the vehicle. He testified that "then you can see flashes occur inside the red Dodge Journey[,]" and the other man is "still standing outside the driver door of the silver Impala. And he's turned and faced the vehicle." Once you see the flashes begin inside the red Dodge Journey, "you see an immediate reaction from the driver of the silver Impala. You see him recoil in different ways and then immediately run away from the scene towards the eastern segment of the McDonald's." Robin explained that the flashes started inside the red vehicle, but as the incident unfolded, you see "something being reached out of the window, and the flashes continue . . . as the individual is fleeing from that area." Robin explained that the driver of the red Dodge Journey, who had circled to the back of the vehicle, "trots to the driver's side" and gets into the driver's seat as shots are still being fired. He testified, "They reverse,

21

and they hurry away from the scene." Robin noted that the McDonald's surveillance system "is almost 360 degrees," and you can see them leave then turn northbound with both occupants in the Red Dodge vehicle.

Robin said that McDonald's employees identified the red Dodge Journey's driver as Everfield. Investigators also determined that Lachassity Johnson, Everfield's aunt, owned the red Dodge Journey. Robin met with Lachassity the next day and took statements from her. He explained that Lachassity told him she received a phone call "very, very quickly after the actual shooting." About three minutes after the shots were fired, Lachassity received a "frantic" call from her mother telling her she needed to leave work "because Darryl Prevost just shot Alfonso Solomon out of your car." Lachassity told Robin that after the shooting, when she arrived home, Everfield, Prevost, Larry, and Dontrell were all in her driveway, but "the red Dodge Journey was nowhere to be found." When she asked where her car was, they told her they did not know. According to Lachassity's statement, her mother picked Larry and Dontrell up from her house and drove them away, but Everfield and Prevost walked from her house "towards a white Buick[.]" Everfield never turned himself in, and on April 18, officers in Port Arthur located the red Dodge Journey.

Robin identified Prevost in court and said that he interviewed Prevost. Robin testified he Mirandized Prevost, and the interview was recorded. According to Robin,

22

during the interview, Prevost admitted to both (1) hanging a gun out the window while the victim was running away and firing a weapon, and (2) firing it before the victim ran. Prevost never told him where he got the weapon. Prevost denied being at Lachassity's house on 25th Street after the shooting and did not provide much detail other than saying Everfield dropped him off "somewhere near Central Mall." When Robin questioned Prevost about where they went after and details surrounding the gun, Prevost responded with "I can't tell you that" or "I ain't going to snitch[.]" Robin described Prevost as "[v]ery coy." Robin testified that Prevost "stated that [Solomon] was reaching funny and that he knew that [Solomon] had a gun, but did not state that he saw a gun at any point." Robin noted the argument lasted a minute and a half to two minutes, and during that time, Solomon got in and out of his car a few times, but Prevost said he never saw a weapon.

Robin identified photographs of the crime scene, including the victim and vehicles, which were admitted into evidence and shown to the jury. Robin testified that when they processed the firearm found in the silver Impala, there was no bullet in the chamber. That firearm was registered to Solomon's mother. Robin described the firearm as having a purple handgrip and being in a pink holster. He explained that when they initially processed the silver Impala, the firearm was on the floorboard parallel to the driver's seat with the front of the barrel facing the door and the grip facing the center of the vehicle.

23

Robin said that Solomon was standing outside the vehicle when he was shot and facing the Dodge Journey. According to Robin, if Solomon were going to get that firearm from the vehicle, he would have to bend down. Robin testified that although Solomon sat down several times during the argument, Robin "never saw him crouch down in a means to reach down to the floorboard of the vehicle." During Robin's testimony, portions of the surveillance video were also played for the jury, which he discussed.

Robin explained that after obtaining warrants, on April 21, 2022, they located Everfield in Baytown. Then, on April 29, 2022, they located Prevost in Baytown and arrested him on a separate warrant. Robin was present during Prevost's arrest, and they immediately arranged a custodial interview of Prevost at the Baytown Police Department.

Robin identified a thumb drive containing a copy of Prevost's recorded interview, which was admitted into evidence and played for the jury. Robin testified that Prevost told him that he and Everfield went to McDonald's to get something to eat in a red Dodge Journey, and Solomon was in line when they arrived.

Prevost then told Robin that Solomon pulled up beside them and waited for Everfield to come out. Robin explained that according to Prevost, when Everfield came out, Solomon approached Everfield, but this was different than what the surveillance video showed. Instead, the surveillance video showed Everfield

24

approach Solomon's car and looked through the windshield, then Solomon exited the vehicle, because the entire argument between them occurred just outside the door of the Impala. Robin also noted that Everfield walked around the driver's side door and got face-to-face with Solomon, although, at that point, all Solomon had done was park. Prevost claimed that Solomon came out, walked up to Everfield and told Everfield that he was going to kill him, but if true, that meant Everfield approached Solomon repeatedly after he heard Solomon threaten him.

Robin testified that during the interview, Prevost relayed that Solomon told both Everfield and him, "I'm fixing to kill you[,]" and that Solomon then reached for a gun. According to Prevost, Solomon threatened him, but he did not shoot until Solomon started reaching for the gun. Later in the interview, Prevost told Robin he did not see a gun. Robin testified that on the surveillance video, Robin never saw Solomon reach for a gun.

Prevost claimed he never had a problem with Solomon until Solomon said that to him. Robin denied that Lachassity told him Prevost was afraid of Solomon. During the interview, Prevost told Robin that he knew Solomon had a gun on him, that "I just know[,]" and "because he threatened me." Robin testified that Prevost claimed he had his window cracked but he heard Solomon threaten to kill both Prevost and Everfield. Prevost claimed he did not know what Everfield and Solomon argued about, even with his window down. Prevost focused on Solomon getting in

25

and out of the vehicle, which Robin said Prevost did several times, and nobody was shot during that time.

In the interview, Prevost said he shot Solomon about five times. When Robin asked Prevost what Solomon did when Prevost shot him, Prevost said he did not know. Robin said the only thing Prevost claimed to remember was that Solomon threatened his life. Prevost told Robin that he shot Solomon, and after Solomon ran, Prevost shot him again, which was consistent with the video surveillance evidence. Robin explained that the surveillance video showed Everfield re-engaging Solomon after Prevost claimed Solomon threatened to kill them several times. It also showed Solomon opening the door with his left hand when he is shot, and Robin again testified the video never showed Solomon bend down and reach for a gun, even when he sat down in the car. Robin described the point in the video where the shots began and explained the shots continued as Solomon reached the front of his vehicle; despite Prevost's claim of self-defense, he shot at Solomon's back as Solomon ran away.

During the interview, Prevost told Robin that he normally does not carry a gun, but he had one that day for protection but would not tell Robin who the gun belonged to. According to Robin, Prevost claimed that he did not know what he did with the gun, and the police never found it. Elsewhere in the interview, Prevost said he thought he left the gun in the red Dodge Journey, but police did not find it when

they processed that vehicle. When asked where they went after the shooting, Prevost gave different answers. Prevost stated that Everfield dropped him off by the mall parking lot and denied being at Lachassity's house on 25th Street after the shooting.

Robin testified that although they apprehended Prevost and Everfield in Baytown, Prevost claimed they did not go to Baytown together. Prevost said a "friend" gave him a ride to Baytown, but Prevost would not provide any other details. Robin explained that several times during the interview, when asked questions that would implicate Prevost and Everfield, Prevost responded with "huh," which Robin characterized as a "delay tactic." Robin described Prevost as being "very coy" about many details. Robin testified that outside of what Everfield said and what Prevost told him in the interview, Robin saw no other evidence of self-defense or that it applied in this case.

Robin testified that when they arrested Prevost, they found several cell phones, and he requested an extraction be done on the phones. Robin identified several messages pulled from Prevost's phone that were admitted and read to the jury. One message from Prevost's phone said, "A lil female darry mess wit text me and say she just got off the phone with him he said go to the police station and tell them he threatened my Life." Robin testified that recorded jailhouse conversations showed that Everfield and his father talked, with his father instructing him not to talk to police, and another message from Prevost questioned why Everfield instructed him

27

to do something different. Robin testified later that in jailhouse conversations, Everfield urged someone to give Prevost a message to turn himself in. Robin said those calls also showed Everfield claiming it was self-defense, and Solomon threatened to kill him and Prevost. Robin described another call where Everfield told his mother that Prevost did not give Solomon a chance to reach for the gun and that Solomon did not make it back to the car before Prevost started shooting him.

Robin described another message from Prevost about going to Baytown, which he interpreted to mean that he wanted to get out of the area and needed a place where he would not be found. Another message pulled from Prevost's phone stated, "I been just thinking about what I did[,]" and a selfie from April 28 showed him holding a Glock 9-millimeter firearm with an extended magazine. Robin noted that Prevost told him during the interview he does not carry guns.

**Testimony of Dr. William McClain**

William McClain testified that he is a forensic pathologist and medical examiner. McClain was asked to pull Solomon's autopsy record in this case. He explained that Dr. Ray Fernandez performed Solomon's autopsy on April 18, 2022. McClain outlined the information he reviewed before making his own determination about the cause and manner of death. McClain testified that Dr. Fernandez determined the cause of death to be multiple gunshot wounds and the manner of

28

death to be homicide, which McClain agreed with. During his testimony, he discussed various autopsy photographs admitted into evidence.

McClain noted that Solomon had four gunshot wounds, and no projectiles were in Solomon's body during the autopsy, which proved they all exited. He explained that Solomon had two wounds to his chest that exited the back, one wound to his left upper arm, and another that entered the left hip and exited the left buttock. McClain opined that the gunshot wounds to the front of Solomon's chest were entrance wounds, and the holes in his back were exit points. According to McClain, "these bullets came in on each side of the chest and crossed paths and more or less exited on opposite sides of the back."

**Testimony of Darryl Prevost**

Darryl Prevost testified in his defense. Prevost denied murdering anyone but said that on April 14, 2022, he shot Solomon because he feared for his life. He claimed he previously told Everfield's aunt that Prevost threatened him about three times over the span of a week in February 2022, a couple of months before the shooting. He claimed that on one occasion, Solomon "pulled a gun" and said, "What's up?" According to Prevost, he began carrying a weapon because of this incident with Solomon. Prevost admittedly did not tell Robin about Solomon's prior threats, because he did not believe it was relevant to the night of the shooting.

Prevost testified that he had known Everfield since they were kids, but they began spending time together when they were eighteen or nineteen. He knew Everfield's mother and aunt, and although he did not hang out with Everfield's brothers Larry and Dontrell, he knew them. Prevost later acknowledged that Larry had three children with Prevost's sister and tried to explain why he told Detective Robin he did not know Everfield's brothers. He testified that he had not seen Everfield carry a gun, but he saw Solomon with a gun "multiple times" before the incident. Prevost testified that Solomon and Everfield were "beefing," although he did not know if it was about Kenedi Charlot.

Prevost said that he and Everfield went to McDonald's to get food and arrived at "10:40 something." Prevost testified he sat in the vehicle and played on his phone while Everfield went inside to order food. A car pulled up beside them, but he did not recognize the Impala and did not know it was Solomon in the car. Although he told Robin that when Everfield came out of the McDonald's, Solomon approached him, he agreed the video showed otherwise but explained he did not see that since his head was down. According to Prevost, when he raised his head up, Solomon was getting out of the car, and Everfield "was right there." Solomon did not get out of his vehicle or say anything to Prevost until Everfield came out of McDonald's.

Prevost indicated that he began paying attention when the Impala door opened, and he rolled down the window in the middle of their conversation. He first realized

30

it was Solomon when Solomon got out of the car, which made him worry, because he thought of the previous occasions where Solomon had threatened him. Prevost testified Solomon then threatened to kill them both and seemed to want to argue with both. Even so, Prevost claimed he could not hear what Everfield and Solomon argued about. Prevost explained that in the middle of the confrontation, Everfield opened the car door and wanted his phone as Solomon threatened to kill them, so Prevost gave it to him.

Prevost explained that at one point, Everfield was getting back in the car, but Solomon must have said something to bring Everfield back to him. He agreed that Everfield was unarmed yet felt comfortable enough to walk back to Solomon, who Prevost claimed just threatened to shoot him. Prevost said his gun was the only one in the Journey, and it was in the door as all this unfolded. He also said he rolled his window back up.

According to Prevost, Solomon told them he was going to kill them both "At least two to three times. He was repeating himself saying he was going to Swiss cheese us. Swiss cheese us, kill us and switch cheese us." Prevost said he took that to mean Prevost was going to "shoot us up, like shoot up the car with a switch." Prevost said that Solomon ran because Prevost started shooting "when he reached for his gun. When he was in and out the car, . . . I don't know if he grabbed it then or not. He sat down, got out, sat down, got out, closed the door and opened the door."

Even so, Prevost testified that he never saw a gun and explained that "if he threatened our life, you got to have a gun if you're going to threaten my life." He also claimed to be "worried about death." Prevost testified that Solomon's hands were not on the car door, and he was reaching down for a gun on the floorboard while his door was opened; Prevost insisted that he acted in self-defense and saw Solomon reach for a weapon although the video showed Solomon standing up facing Everfield. He disputed what Everfield said about Solomon not making it back to the car, since according to Prevost, Solomon never left his car to begin with. Prevost indicated he fired four to five shots and kept shooting because he "blanked out, was scared." Prevost told the jury, "I was going to die if I didn't do . . . what I did." Prevost testified he defended himself.

Prevost claimed that after the shooting they left because Everfield was concerned about his probation, Prevost wanted to stay. Prevost testified he was also scared because he thought Solomon had called someone else to come to the McDonald's. Yet, later Prevost testified that he did not really believe Solomon called anyone to come there, but "it's a possibility." Prevost said that Everfield dropped him off, and they were not in contact after that. He denied being at Lachassity's house on 25th Street after the shooting or saying that Solomon should not have threatened them and reached for a gun. Prevost noted that he walked to a girlfriend's house, then was "dropped off to Houston by a friend the next day." Prevost said he

32

left the gun in the vehicle, but he initially told Robin he did not know where it was. He also claimed he did not remember where he obtained the gun.

During his testimony, Prevost discussed the surveillance video as it was played for the jury. He also attempted to explain the meaning of his text messages. Prevost asserted that the photograph of him with the gun downloaded from his phone was taken a month before the shooting, after Solomon threatened him. Although the photograph was dated April 28, 2022, after the shooting, Prevost claimed the date was wrong, and he "never touched a gun after the shooting."

## Additional Evidence

A 911 call was admitted into evidence, where the caller reported a shooting at the McDonald's and described the shooter as being in a "red SUV." The 911 recording also captured the license plate of the victim's vehicle. Additional evidence included, among other things: photographs of the vehicles, scene, and Solomon; McDonald's video surveillance footage; Prevost's recorded interview with Robin; video of officers locating the red Dodge Journey; and text messages from Prevost's phone.

## Guilty Verdict and Punishment

The jury found Prevost guilty of murder as charged in the indictment. During the punishment phase, two of Solomon's relatives testified about how his death impacted the family. The defense did not put on any additional evidence during the

punishment phase. In a special punishment issue, the jury found that Prevost did not prove he committed the murder under the immediate influence of sudden passion by a preponderance of the evidence and assessed punishment at seventy-six years of confinement. The trial court sentenced Prevost accordingly.

## ISSUE ONE: SUFFICIENCY OF THE EVIDENCE

In his first issue, Prevost asks whether the evidence was insufficient to support a conviction for murder based on self-defense.

### Standard of Review and Applicable Law

In evaluating legal sufficiency of the evidence to prove the charged offense, we view all the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson v. Va.*, 443 U.S. 307, 318–19 (1979); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007); *see also Metcalf v. State*, 597 S.W.3d 847, 855 (Tex. Crim. App. 2020). Under the *Jackson* standard, we defer to the jury's responsibility to fairly resolve conflicting testimony, weigh the evidence, and draw reasonable inferences from basic facts to ultimate facts. *See Metcalf*, 597 S.W.3d at 855; *Hooper*, 214 S.W.3d at 13, 16–17. The jury as factfinder is the sole judge of the weight of the evidence and witnesses' credibility, and it may believe all, some, or none of the testimony presented by the parties. *Metcalf*, 597 S.W.3d at 855 (citations omitted). We do not reweigh the evidence or determine the

credibility of the evidence, nor do we substitute our judgment for the factfinder's. *See McPherson v. State*, 677 S.W.3d 663, 664 (Tex. Crim. App. 2023); *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007) (citation omitted). "Each fact need not point directly and independently to a defendant's guilt, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Balderas v. State*, 517 S.W.3d 756, 766 (Tex. Crim. App. 2016) (citation omitted).

A person commits murder if he "intentionally or knowingly causes the death of an individual[.]" Tex. Penal Code Ann. § 19.02(b)(1). Texas recognizes the defense of justification, which excludes criminal responsibility for otherwise criminal behavior. *See id.* § 9.02. Self-defense is a type of justification. *See id.* § 9.31. "[A] person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." *Id.* § 9.31(a); *Gamino v. State*, 537 S.W.3d 507, 510 (Tex. Crim. App. 2017). A person is justified in using deadly force if he would be justified in using force under section 9.31, and he reasonably believed that deadly force was immediately necessary to protect himself against another's use or attempted use of deadly force. *Gamino*, 537 S.W.3d at 510; *see also* Tex. Penal Code Ann. § 9.32(a). "Deadly force" is defined as "force that is intended or known by the actor to cause, or in the manner of its intended use is

capable of causing, death or serious bodily injury." Tex. Penal Code Ann. § 9.01(3).

"[R]easonable belief" is a "belief that would be held by an ordinary and prudent man

in the same circumstances as the actor." *Id.* § 1.07(42).

As for the defense of justification,

> a defendant bears the burden of production, which requires the production of some evidence that supports the particular defense. Once the defendant produces such evidence, the State then bears the burden of persuasion to disprove the raised defense. The burden of persuasion is not one that requires the production of evidence, rather it requires only that the State prove its case beyond a reasonable doubt. When a jury finds the defendant guilty, there is an implicit finding against the defensive theory.

*Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003) (citing *Saxton v. State*,

804 S.W.2d 910, 913–14 (Tex. Crim. App. 1991)); *see also Braughton v. State*, 569

S.W.3d 592, 608 (Tex. Crim. App. 2018). In reviewing a challenge to the sufficiency

of the evidence to support the jury's implicit rejection of self-defense,

> we look not to whether the State presented evidence which refuted appellant's self-defense testimony, but rather we determine whether after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact would have found the essential elements of [the offense] beyond a reasonable doubt and also would have found against appellant on the self-defense issue beyond a reasonable doubt.

*Saxton*, 804 S.W.2d at 914 (citations omitted); *see also Braughton*, 569 S.W.3d at

608–09 (citation omitted). Self-defense is a fact issue the jury determines, and it is

free to accept or reject any defensive evidence on the issue. *See Saxton*, 804 S.W.2d

at 913–14.

"A jury's decision to reject witness testimony must be rational in light of the totality of the record, and any underlying inferences used to reject that testimony must be reasonable based upon the cumulative force of all of the evidence." *Braughton*, 569 S.W.3d at 611 (citing *Adames v. State*, 353 S.W.3d 854, 860 (Tex. Crim. App. 2011)). Moreover, a jury may not disregard undisputed objective facts that support only one logical inference. *Id.* "A jury is permitted to reject even uncontradicted defensive testimony, so long as its rejection of that evidence was rational in light of the remaining evidence in the record and is not contradicted by indisputable objective facts." *See id.* at 612 (citing *Saxton*, 804 S.W.2d at 913–14) (other citations omitted).

**Analysis**

Prevost contends that he reasonably believed deadly force was immediately necessary because Solomon threatened to kill him and appeared to be attempting to obtain a deadly weapon. Prevost relies on his testimony indicating that Solomon appeared to be reaching into his vehicle, which is when Prevost claims he fired. Even so, the jury's implicit rejection of Prevost's defense in finding him guilty, showed its disbelief in this testimony as not credible, and our legal sufficiency standard does not allow us to substitute our view of the witnesses' credibility for the jury's. *See id.*; *Saxton*, 804 S.W.3d at 913–14. Here, there was video evidence of the shooting and the events immediately before. Detective Robin provided detailed testimony

37

regarding what the video showed for the jury. The jury also watched that video, which showed when the shots began, and that Prevost continued firing at Solomon while he ran away. They were able to compare the video to Prevost's testimony and determine for themselves if it appeared Solomon was reaching into his vehicle for a weapon when Prevost shot him. The jury was free to disbelieve Prevost's testimony and to find either that Prevost did not believe deadly force was immediately necessary or that such a belief was unreasonable.

As in *Braughton*, and many other self-defense cases, this case hinged on Prevost's credibility and whether he believed deadly force was immediately necessary or whether such a belief was reasonable. There are multiple reasons the jury could have rejected Prevost's testimony as not credible. Contrary to Prevost's testimony that Solomon was reaching in his vehicle when he shot, Detective Robin explained that the video shows otherwise, and that Solomon was standing outside his car with his hand on the door. Prevost asserted that he heard Solomon repeatedly threaten to kill Everfield and him, yet Prevost testified he could not hear anything else as the men argued right outside his door. Prevost claimed that Solomon exited his vehicle and approached Everfield as Everfield exited the McDonald's when surveillance footage showed otherwise. When Robin asked Prevost in his interview whether he had any negative history with Solomon, Prevost denied they had any issues, but during trial, he testified that Solomon had threatened his life three times

a couple of months before the shooting. Prevost contradicted other witnesses about where he was in the hours after the shooting. Prevost also fled after the shooting and hid in Baytown. Text messages indicated that he and Everfield seemed to have a plan to tell police that Prevost had been threatened. Although police found a gun in the car that Solomon was driving, it was registered to his mother, it was holstered, and it did not have a round in the chamber. The evidence also shows that Prevost continued to shoot at Solomon while Solomon ran away.

We conclude "[t]here is sufficient evidence in the record to rationally support the jury's rejection of appellant's version of events." *See Braughton*, 569 S.W.3d at 611. Given the video evidence showing Solomon's movements, Prevost's inconsistencies in his ability to hear what was said outside of the vehicle, Prevost's inconsistent statements regarding the facts, the fact that he fired shots at Solomon while Solomon ran away, the fact Prevost fled the scene, and other testimony contradicting his whereabouts after the shooting, as well as the obligation of the jury to weigh the evidence and assess the credibility of the witnesses, we cannot conclude that the jury acted irrationally by declining to believe the defensive claim made by Prevost.

Without any evidence that the jury was irrational in rejecting Prevost's testimony wherein he asserted he acted in self-defense, we will not substitute our judgment for the jury's. *See id*. Viewing the evidence in the light most favorable to

the jury's verdict, the jury could have determined that Prevost did not believe deadly force was immediately necessary or his belief was unreasonable. *See Jackson*, 443 U.S. at 318–19; *Metcalf*, 597 S.W.3d at 855; *Braughton*, 569 S.W.3d at 609; *Hooper*, 214 S.W.3d at 13. As outlined above, self-defense is a fact issue the jury determines, and this jury was free to accept or reject Prevost's defensive evidence on the issue. *See Braughton*, 569 S.W.3d at 612–13; *Saxton*, 804 S.W.2d at 913–14. The jury was free to weigh the evidence adduced at trial, which among other things, included video of the shooting and to compare that to Prevost's testimony. *See Metcalf*, 597 S.W.3d at 855.

After viewing all the evidence, we conclude that a rational trier of fact could have found the essential elements of murder beyond a reasonable doubt and found against Prevost on the self-defense issue beyond a reasonable doubt. *See Braughton*, 569 S.W.3d at 609; *Saxton*, 804 S.W.2d at 914. We hold the evidence was sufficient to support Prevost's murder conviction and for the jury to reject the claim of self-defense. *See Jackson*, 443 U.S. at 318–19; *Metcalf*, 597 S.W.3d at 855; *Hooper*, 214 S.W.3d at 13. We overrule Prevost's first issue.

## ISSUE TWO: SUDDEN PASSION

In his second issue, Prevost asks whether the evidence was sufficient to establish by a preponderance of the evidence that the murder was committed under the immediate influence of sudden passion. The jury's verdict indicated all jurors

40

agreed that "the Defendant has not proved that he acted under the influence of sudden passion."

**Standard of Review and Applicable Law on Sudden Passion**

Sudden passion is an affirmative defense and mitigating circumstance addressed at punishment. *See* Tex. Penal Code Ann. § 19.02(d); *Beltran v. State*, 472 S.W.3d 283, 293 (Tex. Crim. App. 2015). During punishment, "the defendant may raise the issue as to whether he caused the death under the immediate influence of sudden passion arising from adequate cause[,]" and if he proves so by a preponderance of the evidence, the offense is a second-degree felony. Tex. Penal Code Ann. § 19.02(d). "Sudden passion" is "passion directly caused by and arising out of provocation by the individual killed or another acting with the person killed which passion arises at the time of the offense and is not solely the result of former provocation." *Id.* § 19.02(a)(2). "Adequate cause" is a "cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection." *Id.* § 19.02(a)(1). Generally, the issue of sudden passion is "resolved exclusively by the jury's assessment of whether the witness is credible." *Cleveland v. State*, 177 S.W.3d 374, 389 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd).

In criminal cases, affirmative defenses may be evaluated for legal and factual sufficiency. *See Butcher v. State*, 454 S.W.3d 13, 20 (Tex. Crim. App. 2015). In a

legal-sufficiency review of an affirmative defense, we first examine the record for a scintilla of evidence favorable to the jury's finding and disregard all evidence to the contrary unless a reasonable factfinder could not. *See id.*; *Matlock v. State*, 392 S.W.3d 662, 669–70 (Tex. Crim. App. 2013). The jury's finding rejecting a defendant's affirmative defense should be overturned for lack of legal sufficiency only if the appealing party establishes that the evidence conclusively proves his affirmative defense, and "'no reasonable [factfinder] was free to think otherwise.'" *See Butcher*, 454 S.W.3d at 20 (quoting *Matlock*, 393 S.W.3d at 670).

In a factual-sufficiency review of a finding rejecting an affirmative defense, we examine the evidence in a neutral light. *See id.*; *Matlock*, 393 S.W.3d at 671. We cannot overrule a jury's finding rejecting a defendant's affirmative defense unless, "'"after setting out the relevant evidence supporting the verdict, the court clearly states why the verdict is so much against the great weight of the evidence as to be manifestly unjust, conscience-shocking, or clearly biased."'" *See Butcher*, 454 S.W.3d at 20 (quoting *Matlock*, 393 S.W.3d at 671).

**Analysis**

Prevost focuses on evidence that he was afraid and that his actions resulted from Solomon's provocation to the degree Prevost did not have sufficient capacity before firing his gun. Evidence supporting the jury's finding rejecting the sudden passion issue included Robin's testimony and video evidence showing that Solomon

never addressed Prevost as he sat in the car. The evidence showed that the verbal altercation was between Everfield and Solomon alone, and Everfield, as the person in the confrontation, was not so afraid that it stopped him from repeatedly approaching Solomon. The evidence also established a chain of affirmative actions by Prevost, including grabbing his firearm from the door, rolling down a window, firing shots at Solomon, and continuing to fire shots at Prevost as he ran away. The evidence supporting sudden passion came from Prevost's testimony, and we outlined in issue one how the jury could have determined he was not credible. Since more than a scintilla of evidence supports that these circumstances would not "commonly produce a degree of ... terror in a person of ordinary temper[ ] sufficient to render the mind incapable of cool reflection[,]" it was legally sufficient to support the jury's finding rejecting sudden passion. *See* Tex. Penal Code Ann. § 19.02(a)(1), (d); *see also Butcher*, 454 S.W.3d at 20.

Examining the evidence in a neutral light, we cannot say that "the verdict is so much against the great weight of the evidence as to be manifestly unjust, conscience-shocking, or clearly biased." *See Butcher*, 454 S.W.3d at 20; *Matlock*, 393 S.W.3d at 671. Prevost testified that he was afraid for his life. Video evidence from his interview with Robin showed him saying he was "terrified" after the fact. He also testified that Solomon threatened to kill them and reached for a gun. Yet, the video evidence did not show Solomon reaching into the vehicle for a gun, and as

explained above, the surveillance video showed this was a verbal altercation. A jury could likewise reasonably conclude the series of affirmative actions that Prevost undertook before shooting Solomon showed he acted in a deliberate manner, and he was "capable of cool reflection." *See* Tex. Penal Code Ann. § 19.02(a)(1). We defer to the jury's responsibility to weigh the evidence and witnesses' credibility, and it was free to determine Prevost's testimony was not credible. We conclude the evidence was factually sufficient to support the jury's finding rejecting Prevost's claim of sudden passion. *See Butcher*, 454 S.W.3d at 20; *Matlock*, 393 S.W.3d at 671; *see also* Tex. Penal Code Ann. § 19.02(a)(1), (d).

We hold the evidence was legally and factually sufficient to support the jury's rejection of the affirmative defense of sudden passion. *See Butcher*, 454 S.W.3d at 20; *Matlock*, 393 S.W.3d at 670–71. We overrule issue two.

## CONCLUSION

Having overruled Prevost's issues, we affirm the trial court's judgment.

AFFIRMED.

W. SCOTT GOLEMON
Chief Justice

Submitted on August 25, 2025
Opinion Delivered December 10, 2025
Do Not Publish

Before Golemon, C.J., Johnson and Chambers, JJ.

44